**Yulonda E. FOSKEY, Karla Foskey p. p. a. Yulanda E. Foskey**

v.

**UNITED STATES of America.**

Civ. A. No. 74–278.

United States District Court,
D. Rhode Island.

June 15, 1979.

Supplemental Memorandum Opinion
March 18, 1980.

1048

Leonard Decof and Mark S. Mandell, Providence, R.I., for plaintiffs.

Paul F. Murray, U.S. Atty., Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., for defendant.

## OPINION

PETTINE, Chief Judge.

This medical malpractice case alleges tortious conduct in the treatment and diagnosis of a seizure disorder suffered by the minor plaintiff, Karla Foskey, born of the plaintiffs, Yulonda Foskey, now O'Neil, and Preston Lee Foskey, an officer in the United States Coast Guard.

Jurisdiction is founded in 28 U.S.C. §§ 1346, 2671–2680.

Though the alleged period of negligence was between February 14 and mid-July 1972, an understanding of the respective positions of the litigants requires a factual development commencing on July 26, 1971, when Karla was 10 weeks old and was treated for acute bronchitis. The tragedy that has befallen this unfortunate child followed this episode of bronchitis during which she had temperatures ranging between 103° and 106°. About two months

after her recovery, the mother noticed impairment of the baby's hearing coupled with a slow progress of development. In January or early February of 1972 she also noticed Karla manifested unusual motor activity such as back arching, staring, or eye fixation.

On February 9, 1972 Mrs. O'Neil took Karla to the local Coast Guard dispensary for treatment of a cold, not related to this action. During this visit Karla made one of her back arching movements, and the mother told the attending physician of Karla's other behavior, whereupon he suggested the child be taken to the Philadelphia Naval Hospital for a neurological work up. On February 14, 1972 the parents did this. There she was examined by Dr. Harvey Danits, a staff pediatrician who was at the time in the United States Navy.

According to the plaintiffs, at this initial meeting Dr. Danits was told about the bronchitis episode, back arching, hearing loss, and pattern fixation, and also was told that they wanted him to refer their child for neurological services. In addition to Karla's history, the plaintiffs claim they also informed Dr. Danits that during pregnancy Mrs. O'Neil had taken, as approved by her doctor, antihistamines, on one occasion one half of an amphetamine tablet as prescribed and antibiotics for a sore throat and fever, and had been in an automobile accident in the eighth month of pregnancy.

Dr. Danits' reply to all this was that the back arching and pattern fixation were habits; that Karla had a growth and development problem; and that a neurological work up or an electroencephalogram should be deferred in order to, as he stated, "let us check her over, let us follow some paths, let us decide whether or not she needs a neurological work up," because he wanted to do tests to rule out basic medical, amino acid and genetic problems. However, he did perform some tests at this visit, and from February 14 through June 20, 1972, he saw Karla on a number of occasions. Sequentially the visits were as follows:

1) *February 22, 1972*—Mrs. O'Neil testified on this visit Dr. Danits saw Karla arch

her back; he again told the parents it was habit.

2) From *February 22, 1972* and for approximately two months thereafter Dr. Danits continued to see Karla. Mrs. O'Neil testified that, "On every visit we discussed with Dr. Danits that she was still doing this back arching bit, that I was concerned about on the initial visit; on the second visit we told him not only was she now fixating on the mesh of the playpen, but she was also fixating her eyes, locking her eyes, is the way I described it, on the picture on the wall in our living room." Mrs. O'Neil further testified that she made it very clear on each visit that they wanted a neurological work up.

3) Between *April 10, 1972* and *early June*, Karla was not taken to the hospital per instructions from Dr. Danits, who said there was no need to do so as she only had a growth and development problem, and that he wanted to wait for the results of various tests he had ordered before seeing Karla again.

4) *June 4, 1972*—Karla experienced respiratory problems. She was taken to a hospital other than the Philadelphia Naval Hospital, where her condition was diagnosed as croup. After three days she was discharged. Dr. Danits was advised of this illness by Mrs. O'Neil who went on to tell him that she thought Karla had a seizure which had affected her respiration.

5) *June 12, 1972*—Karla was taken to Dr. Danits who now agreed to schedule an EEG. On this visit, he also reviewed the results of the various tests he had taken and stated that in his opinion Karla was progressing and that she appeared to be catching up.

6) *July 10, 1972*—The parents met with Dr. Danits to discuss the results of the EEG taken on June 20, 1972. He told them the EEG was abnormal but not to worry; that there was nothing specific about it; and that it did not show any evidence of seizure activity. He did not prescribe at this time or at any other time any anticonvulsant medication.

The government argued that Dr. Danits never saw the EEG as this was Karla's last visit due to Mr. Foskey's transfer to the Boston area. Mrs. O'Neil was given all of Karla's medical records including the EEG to take with her. The government contends that Mrs. O'Neil is not correct in saying Dr. Danits gave her the records because the hospital records show the last visit was July 10 and the records were withdrawn on July 12. It states that this substantiates its position that Dr. Danits never saw the EEG before Karla left his care. The Court is not impressed by this argument, and there was evidence that disproved the government's position. I do not feel a long factual analysis on this point is warranted. It seems strange to this Court to claim that a doctor who finally concluded an EEG was necessary and ordered one to be taken would display such insouciance as not even to look at it before the patient leaves him.

Following the transfer, Mrs. O'Neil, on July 31, 1972, had Karla examined by Dr. Gary Velat, a pediatrician from the Chelsea Naval Hospital. After reviewing the records from the Philadelphia Naval Hospital and receiving Karla's history from Mrs. O'Neil, he made immediate arrangements for Karla's admission to the Chelsea Naval Hospital for a complete neurological work up. On August 2, 1972, before such admission materialized, Mrs. O'Neil witnessed the seizure which is at the heart of this controversy. While in her playpen Karla gasped; Mrs. O'Neil, thinking she had aspirated something, felt her throat; she could find nothing. Karla started to twitch violently, became quite blue and stopped breathing. Mrs. O'Neil applied mouth to mouth resuscitation which started Karla breathing again. She was taken to the South Weymouth Dispensary where she was examined, x-rayed, placed under an oxygen mask and then transferred to the Chelsea Naval Hospital where she remained for several days. There, the medical staff found the child had an abnormal EEG, and had suffered a grand mal seizure. Among other things they placed her on anticonvulsant medication.

It is significant to note that though this baby was impaired by the bronchitis incident she experienced on July 26, 1971, Mrs. O'Neil testified she did continue to progress albeit at 50%–60% rate. After the August 2, 1972 seizure her hearing acuity was reduced, muscle tone deteriorated, alertness decreased and seizures became progressively worse.

From August 2, 1972 on there were a series of hospitalizations for various reasons including institutionalization at the Hospital for the Mentally Retarded in Delaware from April 1, 1974 to December 1, 1975. Mrs. O'Neil also testified that from December of 1975 to August of 1977 Karla was treated through the Institutes for the Achievement of Human Potential in Philadelphia, a non-profit institution which specializes in training uninjured brain cells. It appears nothing much could be done for this child.

Dr. Gary Velat, now Chief of Pediatrics at the Naval Submarine Medical Center in Groton, Conn., who appeared and testified by special permission from his superior officers, saw Karla both before and after the August 2, 1972 incident while at the Chelsea Naval Hospital.

There is no doubt that Dr. Velat is a highly qualified pediatrician, properly regarded as an expert in his specialty. As previously stated, on July 31, 1972, he received a history from the mother and also made a fast review of Karla's medical records. He opined that the baby was in fact having seizures and that on August 2 she suffered a major motor seizure—"a grand mal type of seizure." This he attributed to the failure of Dr. Danits to have a neurological work up and an electroencephalogram when Karla was first seen by him. The sum and substance of his testimony is that when Dr. Danits first saw Karla, and at least after the second or third visit, he should have engaged in a neurological study of the baby. He comes to this conclusion on the very record made by Dr. Danits himself. In other words, apart from what Mrs. O'Neil claims she told Dr. Danits, his own

notations of slow development, small child, metabolic and endocrine problems for psychomotor retardation, hypotomia, and hearing loss reflect his negligence. As Dr. Velat stated, all these things "may have had a component of etiology of the central nervous system—a neurological work up would have been one of the basic things [to do]." Dr. Velat went on to say

Besides the examination one would have expected basically neuroskull series, x-rays of the skull looking for many things actually and an EEG, not necessarily just to show seizure disorder, but to show a symmetry tumor, cerebral atrophy, any of the many conditions. In other words, even if he had no diagnosis of seizure disorder he had a diagnosis of a state of a patient, state of an infant which had multiple findings as well as complaints related to the central nervous system and the basic things normally done by pediatricians at that time are, besides an examination, skull x-rays, EEGs, perhaps even spinal tap, lumbar puncture . . . .

He further testified that not to do these things was a deviation from the proper standard of care; that the records showed to a reasonable degree of medical certainty that Karla was experiencing a seizure disorder on February 14 to June 12; that if an EEG had been performed during this period of time, it would have shown the existence of such seizure disorder; that the standard of care required that Karla be put on anticonvulsant therapy, and had anticonvulsant medication been administered at any time from February 14, 1972 to June 12, 1972, the grand mal seizure of August 2 would not have occurred; and that if the August 2 seizure had not occurred she would have been less retarded than she is today. She would be able to talk, walk, and care for herself, and indeed be able to engage in certain kinds of employment such as assembly worker, whereas today she cannot and will never be able to do any of these things.

It should be noted that Dr. Velat did not administer anticonvulsant medication on July 31 when he first saw Karla. He admitted that had he done so Karla would not have had the August 2 seizure. However, he explains such medication is not indiscriminately administered. It is first necessary to "know the patient," to know what the underlying difficulties might be. His contention is that Dr. Danits had this information, whereas at the first visit he did not have sufficient time for full study and so made arrangements for Karla's hospitalization on August 8, 1972.

Dr. Toussaint LeClerq, board certified neurologist, corroborated Dr. Velat's testimony. He said that Karla's medical records presented objective evidence of involvement of the central nervous system and that Dr. Danits deviated from the required standard of care in not performing a skull x-ray, brain scan, and brain wave EEG. He pointed out that timing was important; it is basic medicine that tests be done early and not at a point when a possible condition might become inoperable. In this case he found the EEG was done at the wrong time. Though he found that part of the work up performed by Dr. Danits had been properly done, he also found that the order of tests was improper. He stated that as early as February 14, 1972 Karla had a seizure disorder and should have been given an anticonvulsant, and that if this had been done the August 2 seizure would not have occurred. The remainder of his testimony conformed to that of Dr. Velat. In short, his accusation of negligence is that Dr. Danits did not perform an EEG and did not take a brain scan at the beginning, in February 1972, and that as a matter of basic medicine, he should not have waited until June. He also stated that Dr. Danits failed to administer anticonvulsant medication immediately and that had he done so Karla would now be a functioning human being. Additionally, as I interpret his testimony and so find, Dr. LeClerq accused Dr. Danits of negligence even on June 20, because by this time Dr. Danits had an EEG, and on the basis of the EEG and the history already recorded, Karla should have been hospitalized in Philadelphia.

Further support for the plaintiffs' position was found in the testimony of Dr. Ted

Chronister, a pediatric neurologist, and Dr. Roselise Wilkinson, Medical Director of Children's Institute for the Achievement of Human Potential in Philadelphia, another pediatrician with wide ranging experience in the treatment of children with seizure disorders. Both these doctors have impressive vitae, as practitioners, lecturers, and writers, evidencing their status in the medical world as individuals possessing special expertise in their fields. All agreed with Dr. Velat and there is no need to reiterate the specifics of their findings except as subsequent discussion dictates. Since this case turns on the factual findings, the Court feels compelled, at the risk of an unduly lengthy opinion, to discuss each point raised by the defense which it claims disproves negligence in the treatment and care of Karla.

The government contends that Mrs. O'Neil is not telling the truth in testifying she told Dr. Danits of the bronchitis attack, and of her pre-natal problems while carrying Karla. It points out she even withheld such information during her direct testimony in this Court. The government stresses that during her pregnancy Mrs. O'Neil suffered bleeding in the first trimester, took antihistamines and antibiotics, was in an automobile accident and experienced a period of depression; that none of this appears in the medical records of the Philadelphia Naval Hospital; and that it must follow and the Court should conclude it was never revealed to Dr. Danits. Additionally, the defense directs the Court's attention to the evidence which shows Karla had a minor disorder known as tongue tiedness from birth, and may not have suffered a bronchitis attack on July 26, 1971, but rather encephalitis, as was originally stated by the parents in the claim they filed with the United States Navy. The government also argues that Mrs. O'Neil did not tell Dr. Danits Karla was arching her back until June of 1972 at which time he did order an EEG, which was taken to Massachusetts by the mother before he had time to see it. In conclusion the defense is, "Thus, Dr. Danits did not have the benefit of a complete 'picture' on which to base a future course of

action to treat Karla. . . . Karla was a profoundly ill child before August 2, 1972, and whether the seizure experienced on that date occurred or not, Karla would probably be the same today." (Defendant's Post Trial Memorandum at 28). The government further argues, "that on August 2, 1972, as indicated by medical testimony, Karla was suffering from infantile spasms and thus whether anti-convulsants had been administered or not, the seizure of August 2 could not have been prevented with certainty." (Defendant's Post Trial Memorandum at 24).

If any of these conditions affected Karla before birth and caused her present condition, then, of course, the government is on sound ground asking for a judgment in its favor. The Court will treat each of these allegations.

*The Automobile Accident, Bleeding, Amphetamines*

On cross examination, without changing his original opinion, Dr. Chronister testified in answer to a hypothetical question that Karla may have had a problem since birth. The Court allowed the question on condition that the facts assumed would be proven. The hypothetical assumed as true that for three days following the accident there was no fetal heart beat, that the mother was taking amphetamines and had hypoglycemia and that there was bleeding. The government did not prove there was no fetal heart beat for three days. Indeed, based on Dr. Velat's testimony, which this Court accepts, the assumption is so far-reaching as to warrant summary omission of it from any consideration. Dr. Velat's unimpeached and uncontradicted testimony was that if a fetus doesn't have a heart beat for even an hour, it dies; indeed, if it doesn't have a heart beat for five minutes, it is very likely to die. In addition, the government was not consistent in this attack. In questioning its own expert, Dr. Taranath Shetty, the hypothetical was modified to "there is a question as to the detection of the fetal heartbeat, following the accident." In reply Dr. Shetty stated, "I don't know what importance the auto acci-

dent had, as the details of what else happened at that time are not clear to me." The assumption that the mother was taking amphetamines was not even put to Dr. Shetty. Furthermore, the question to Dr. Chronister did not state that the only amphetamine taken by Mrs. O'Neil was on one occasion when she took one half of one tablet, on prescription from her obstetrician. Finally, no evidence was introduced that hypoglycemia can cause a birth defect. The bleeding was nothing special with Mrs. O'Neil since it happened during her other prior pregnancies, and as the government's own expert, Dr. Shetty, stated, before he could determine its importance he would have to know when it occurred and how much. He attached no significance to it. As to these points, it is this Court's opinion they in no way diminish the plaintiffs' position.

### The Alleged Brain Malformation at Birth

The force of the government's case must lie in the testimony of Dr. Taranath Shetty, a pediatric neurologist with an equally impressive vitae. He concluded the child had a brain malformation at birth which developed during pregnancy. He premised this on Karla's medical record, which he interpreted as showing facial abnormalities, and that the child's head and brow had not grown as well as the body, and on the hospital notes relative to Karla's August 2, 1972 incident which he stated may have been caused by aspiration or an unnoticed seizure. He further said that in his opinion Karla's Philadelphia EEG showed a prehypsarrythmic condition, that is, she was on the way to developing this very serious illness which has a very poor prognosis, and that ninety percent of the children presenting an EEG like Karla's would continue to have seizures even if put on anticonvulsants. In direct contradiction to the plaintiffs' doctors, he concluded that the August 2 episode produced no major consequences, that is, Karla did not suffer at that time a major injury to the brain. He stated that the August 7 hospital entries reading that she tolerated diet well, had eye contact, and rocked on her hands and knees, and the August 3 notes reading that she had grunting respirations, got on her knees and elbows and rocked forward and backward while lying on her back, rubbed her hands rhythmically, and watched movement of a playtoy, are supportive of his conclusion. Finally Dr. Shetty asserted that a grand mal seizure affecting the brain results in a semi-comatose state for several days. In this case such a state is not recorded in the hospital notes. In his opinion Karla's condition pre-dated the August 2 incident and though he could not say Karla would have been as she is today absent the seizure, he did conclude she would have suffered the August 2 seizure whether or not anticonvulsants had been administered prior thereto. On this testimony the government argues that even if Dr. Danits was negligent in not administering anticonvulsant medication, it was not the cause of her present condition; Karla would have had the August 2 seizure at any rate.

Though Dr. Shetty claims Karla had a malformed brain at birth, he offers little to indicate what caused this malformation. Paraphrasing his testimony, he said he did not know what caused the brain to be malformed, but felt that the auto accident or the first trimester bleeding were the "most likely things that happened" and the reason why Karla's condition is as it now exists; yet he also testified, "There is not enough data to tell me what produced the abnormal development." At another point he said he did not attach importance to the auto accident for lack of detail and admitted the significance of the bleeding depended on the extent and date it occurred, neither of which he knew. The other insults allegedly imposed on the fetus, such as the mother's hypoglycemia, the ingestion during pregnancy of antihistamines and antibiotics and a period of depression experienced by Mrs. O'Neil, though constantly pressed throughout the trial and argued in post trial briefs, were never shown to have had any medical significance on Karla's development. The ineluctible conclusion from this is that the basal cause stated by Dr. Shetty for the alleged malformation of the brain at birth is on no higher a plateau than remote possibility.

Nevertheless, Dr. Shetty stands fast in asserting Karla did have a malformed brain, whatever the cause. This leads us now to the merits of his reasons for this conclusion. This is important because it is the only attack, as I see it, that can disable the plaintiffs' case; it is the basic fact the government relies upon in arguing it should not be liable because Karla's destiny was cast at birth and no medical forces could have prevented it. Dr. Shetty offered the following facts and conclusion as the bases for his position:

a) Hospital record entries that Karla had certain somatic anomalies, i. e., that she had a large tongue and a short finger and was termed a "FLK" (funny-looking kid).

b) Based on Dr. Danits' notes and charting Karla's head size from 8½ months to 19 months, she was microcephalic, i. e. had a small head.

c) The EEG taken in Philadelphia showed Karla was hypsarrythmic.

d) Karla did not suffer a grand mal seizure on August 2 because her behavior after the incident was incompatible with such an experience.

The somatic anomalies relied upon by Dr. Shetty as proving Karla had a malformed brain do not carry telling weight. Dr. Shetty said that a turned-in fifth finger is "a major indication" of a malformed brain and that this was in Dr. Danits' notes. The record does not support this; it shows that Dr. Danits said she had a short finger; it did not curve inwardly and he did not think it was significant. When confronted with this Dr. Shetty changed his position and said a short finger, though he did not know how short, had the same significance. Having labeled this a major indication of a malformed brain, the Court would have expected a more careful and studied approach, especially since both the mother and father have short fifth fingers.

Dr. Shetty also stated that the "FLK" entry is "a big indication that there is a malformed brain." The "FLK" entry in the record is followed by the words "Downs like, Hurlers like, Cretin like." However, tests performed at the Philadelphia Naval Hospital showed Karla did not have Hurler's syndrome and Dr. Shetty himself conceded the child was not Downs-like (mongoloid), nor Cretin-like. Furthermore as Dr. Chronister stated, these three somatic features don't even look like each other. In spite of this, Dr. Shetty accepted "FLK" as a "big indication" resting finally on the "large tongue" as supportive of the "FLK" entry. Here again, it seems to this Court that the "big indication" does not rest on substantial grounds. The only record of a large tongue was made by Dr. Danits; subsequent records have no such entry—indeed, subsequent records state she was normal looking, and as a final note on this point, Dr. Shetty himself stated, "There are a lot of reasons for large tongues, but Karla didn't fit any of these." No physician, of all who had seen Karla, other than Dr. Danits, even mentioned the large tongue or finger as anomalies.

Similarly, the Court finds that Dr. Shetty's finding of a small head size stands alone on a weak platform. All the physicians, except for him, said Karla was not microcephalic. Dr. Velat, who treated Karla in August, stated emphatically she was not microcephalic, that her head "was proportional to her body size." Dr. Chronister said this factor was not significant. Dr. Danits himself said "[h]er length was in the tenth percentile and her head in the third percentile and those two are so close that you could not note a diagnosis. You could say she was a small child." There was much other evidence that the Court does not feel requires discussion.

I likewise find the substantial weight of the evidence is contrary to Dr. Shetty's conclusion that the June EEG showed a prehypsarrythmic condition and therefore that anticonvulsants would not have been of any use.

Capsulizing the more relevant testimony on the point, the record shows that Dr. Danits himself stated that Karla's progress between February 22 and June 12 showed that it "would be extremely unlikely" to have occurred in a child with hypsarryth-

mia. In his opinion Karla did not have such a condition. In accord there was Dr. Toussaint LeClerq, another expert in the field of neurology and neurologial surgery, with a distinguished background, and who, up to six months prior to his testimony, read EEGs for other doctors. Dr. LeClerq said a child with a condition of hypsarrythmia or one leading to it would "probably not" have made the progress Karla did. He also stated the EEG did not indicate that Karla was going to get hypsarrythmia. In fact he stated the EEG was incompatible with hypsarrythmia and he would have liked to see the word crossed from the record. Dr. LeClerq rather emphatically said the term "prehypsarrythmic EEG" did not make scientific sense; that he had never seen the term used in the literature, not even in a recent review of the literature; and that he has "not found the term 'hypsarrythmic EEG'" as a description of a particular EEG pattern leading to hypsarrythmia. Dr. Velat stated it was never proven Karla had hypsarrythmia. At best the entire record on the point is diagnostic suspicion, i. e. a possible cause which in this case was never established throughout Karla's history. Dr. Chronister said there never was a diagnosis of hypsarrythmia but if indeed Karla got hypsarrythmia "it certainly [was] not from a congenital or early developing problem in infancy. It's from something that came on later." On this point, like the others, the Court concludes the evidence is substantially weighted in favor of the plaintiffs.

Finally, Dr. Shetty concluded that Karla's behavior after the August 2 incident was inconsistent with a grand mal seizure. The Court finds this testimony rather confused and in light of all the testimony, it has no persuasive force. As Dr. LeClerq stated, one must look to the entire picture, which shows a marked deterioration in Karla's EEG after August 2. To Dr. LeClerq the post-August 2 development of Karla was controlling because there was no evidence she developed after that. Indeed, the record shows a worsening of Karla's condition. Prior to August 2 Karla was developing. Furthermore, Dr. Velat, who is the only doctor who personally examined Karla be-

fore and after the August 2 incident, stated that on July 31 she was alert, responsive and interacting, whereas after August 2 she was neither alert nor interacting, had no relationship with what he was doing during the examination and had no eye contact with him at all.

The fact remains all the plaintiffs' experts testified that it was the seizure of August 2, 1972, with the resulting hypoxia and brain damage which incapacitated Karla.

■ The Court finds, therefore, that the August 2 seizure would not have occurred had Dr. Danits administered anticonvulsant medication to Karla; that had the August 2 incident not occurred Karla would have been able to walk, talk, care for herself and be trained for employment in come capacity; that she will never be able to do any of those things; and that the August 2 incident was a grand mal seizure.

In closing this factual recitation, I add that these findings are not dependent on the information Mrs. O'Neil relayed to Dr. Danits. Nevertheless, I accept her testimony as to what she told Dr. Danits, even though it is not recorded in the medical records. The Court had the benefit of evaluating her demeanor and though her interest in what is at stake is indeed incredibly significant, she impressed this Court as a sincere and genuinely honest litigant. Furthermore, Dr. Danits claims no recollection of the case and rested totally on the medical entries he made in the hospital record.

### Conclusions of Law

There is no need to discuss the question of venue since the government has expressly conceded that it waived the question in this case; it failed to assert improper venue either by motion or in its answer as provided by Fed.R.Civ.P. 12(h)(1)(B).

■ The Federal Tort Claims Act holds the United States liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, on claims against the govern-

ment for personal injury "caused by the negligent or wrongful act . . . [of its employees] while acting within the scope of [their] . . . employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Exclusive jurisdiction to hear these actions is conferred upon the federal district courts. 28 U.S.C. § 1346(b). There is no dispute that the tort in this case took place in Philadelphia, thus, the applicable law is that of Pennsylvania as more particularly expounded in *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280 (1978).

■ This controversy affords an opportunity to analyze the question of negligence either as a typical case or as one of that particular class falling within § 323(a) of the Restatement (Second) of Torts, "which has been a part of . . . Pennsylvania law of negligence for a dozen years." *Hamil, supra*, 392 A.2d at 1286. For a plaintiff to recover in the typical case, he must sustain the burden of proving that the doctor "guilty" of malpractice did not use the degree of diligence and skill ordinarily exercised by the average physician in the same locality and that the injury resulted from the treatment or non-treatment rendered by the physician giving due consideration to the state of the profession at the time of the malpractice act. Expert medical testimony is a prerequisite to recovery. The standard of care in Pennsylvania conforms to this general statement.

A physician who is not a specialist is required to *possess* and *employ* in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man. However, a physician or surgeon is not bound to employ any particular mode of treatment of a patient, and, where among physicians or surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the physician or the surgeon to adopt either of such methods: [citations omitted].

*Incollingo v. Ewing*, 444 Pa. 263, 274–75, 282 A.2d 206, 213 (1971), *quoting, Donaldson v. Maffucci*, 397 Pa. 548, 553–54, 156 A.2d 835, 838 (1959) [emphasis in original].

■ As the plaintiffs have pointed out, this standard applies to negligent diagnosis as well as negligent treatment.

If a physician, as an aid to his diagnosis, i. e. his judgment, does not avail himself of the scientific means and facilities open to him for the collection of the *best* factual data upon which to arrive at his diagnosis, the result is not an error of judgment but negligence in failing to secure an adequate factual basis upon which to support his diagnosis or judgment.

*Smith v. Yohe*, 412 Pa. 94, 105, 194 A.2d 167, 173 (1963) [emphasis in original].

The plaintiffs' experts all testified that they were familiar with the standard of care for a pediatrician practicing in the Philadelphia area in 1972 and that the treatment rendered by Dr. Danits deviated from that standard, in the manner set forth in the Court's findings of fact.

*Hamil v. Bashline, supra*, presented facts of a particular class of torts where the defendant fails to protect against harm from another source. There the act or omission by the defendant doctor was a failure by the doctor to protect the already sick patient against harm from another source. The doctor failed to provide prompt treatment for a myocardial infarction. Had such treatment been provided, the victim would have had a 75% chance of recovery. The *Hamil* court held that in such a situation § 323a of the Restatement states the requisites for establishing causation. Section 323 provides:

Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or

things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

    (a) his failure to exercise such care increases the risk of such harm, or

    (b) the harm is suffered because of the other's reliance upon the undertaking.

■ Under the *Hamil* court's interpretation of this provision, a plaintiff can establish a *prima facie* case by showing an increase in the risk of harm and the fact harm was sustained, leaving to the jury (or, in a non-jury case such as this, the court as fact-finder) the question whether the increased risk was a substantial factor in producing the harm and hence the cause in fact. The court agreed with the Fourth Circuit's finding in *Hicks v. United States,* 368 F.2d 626, 632 (4th Cir. 1966) that "[i]f there was any substantial possibility of survival and the defendant has destroyed it, he is answerable" and cannot raise conjecture as to the chances the victim had of not being harmed.

Specifically, the *Hamil* court held:

[O]nce a plaintiff has demonstrated that defendant's acts or omissions, in a situation to which Section 323(a) applies, have increased the risk of harm to another, such evidence furnishes a basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.

392 A.2d at 1288.

■ The plaintiffs here have actually proven causation with greater certainty than in *Hamil.* Karla already had a seizure disorder when first seen by Dr. Danits on February 14, 1972. The evidence establishes that on the facts before him, developed through his examination of the child, he should have launched a neurological study and prescribed anticonvulsant therapy. Under the section 323 standard, it would be sufficient to establish a *prima facie* case if the plaintiffs' experts had only testified that Dr. Danits' failure to administer such

therapy increased the risk of Karla suffering a grand mal seizure, that she in fact suffered such a seizure which in turn caused her to stop breathing, leading to hypoxia and resultant brain damage, and that if the August 2 episode had not occurred, Karla would be less retarded today. In that case she would be able to walk, talk, care for herself and have some sort of job. The plaintiffs have more than met this burden. Through their experts, the plaintiffs have proven that the failure to administer anticonvulsant medication did not merely increase the risk of a grand mal seizure; rather, if anticonvulsant medication had been given, the August 2 seizure would have been prevented. Based on this evidence, the Court concludes that the increased risk of harm created by Dr. Danits' failure to prescribe anticonvulsant medication was the substantial factor which brought about the resultant harm to Karla.

Liability is even more pronounced if the standard of the typical case is applied. As already stated, the plaintiffs' experts testified and the Court finds that to a reasonable degree of medical certainty anticonvulsant medication would have prevented the August 2 seizure. In no uncertain terms, Dr. Velat stated there is no question that if such medication had been given, Karla simply would not have had the grand mal seizure of August 2 and would be a functioning human being today. Therefore, Dr. Danits' omission set in motion the force which resulted in the harm suffered by Karla.

■ Consequently, whether we apply the section 323 standard and find that Dr. Danits' failure to prescribe anticonvulsant medication increased the risk of an irrevocable complication of an existing condition and was a substantial factor in the harm which Karla suffered, or apply the standard of the typical case and find that his act or omission in not prescribing anticonvulsants set in motion the force which resulted in the destructive August 2 seizure, the Court concludes he was negligent and therefore that the government must respond in damages.

One final issue remains. The defendant complains that the issues as tried did not conform to the plaintiffs' original administrative claim and therefore that an amendment to the pleading to conform to the proof should not be granted. This argument is without merit. Fed.R.Civ.P. 15(b) states that when issues not raised by the pleadings are tried by consent of the parties, amendment is not necessary. Additionally, if objection is made that issues raised are not within the pleadings, the court may freely allow amendment if it serves the presentation of the action and the objecting party would not be prejudiced; a continuance may be granted to enable the objecting party to meet such evidence. The defense here was fully prepared to meet each and every issue in this case and in no way can this Court find it was prejudiced. Furthermore, it can be said the defense consented to trial on these issues inasmuch as it raised and vigorously argued material issues in the plaintiffs' case. Finally, the Court must note, *sua sponte*, that prior to trial in a chambers conference when defendant raised the same issue, the Court afforded it a continuance which it refused.*

The issue of damages will be heard at a later date, since it was decided at the time of trial that this issue would be treated separately if there was a favorable finding on liability.

## SUPPLEMENTAL MEMORANDUM OPINION

On June 15, 1979 this Court filed an opinion holding the United States government liable for negligently causing injuries to the plaintiff Karla Foskey. At the time it deferred the issue of damages to a later date. (At 1059). This memorandum is confined to the issue of damages as heard during a second trial in September 1979, and to certain belated defenses filed by the government on February 13, 1980. The defendant now contends that this action should be dismissed with prejudice, "in that it was not presented to the appropriate federal agency within two years after such claim accrued. 28 U.S.C. § 2401(b)" (Defendant's Motion to Dismiss). It further urges, at this late date, that "[t]he claims filed in July [1972] do not comply with the statute (28 C.F.R. 14.1 *et seq.*, Sections 14.3(b), (e)) and therefore are a nullity." (Post Trial Memorandum filed Feb. 15, 1980). At the original trial the defendant complained that the issues as tried did not conform to the plaintiffs' original administrative claim and an amendment to the pleading to conform to the proof should not have been granted. I found this argument to be without merit. It now argues that the administrative claims are restrictive in that the plaintiffs cannot recover in excess of the amount claimed therein, i. e., $750,000.

*Damage Award :—*

It would be sheer folly to question Karla's total disability and, indeed, the government does not; "It is undisputed that Karla today is a total care patient requiring 24 hour care." (Defendant's Post Trial Memorandum Relative to Damages at 15). In my opinion which resolved liability, I found nothing can be done for this child; that she will never be able to talk, walk, care for herself or ever be able to engage in any kind of employment. Nevertheless, the plaintiffs in this separate hearing on damages introduced, in addition to an economist's testimony, further medical evidence detailing Karla's present multiple physical impairments.

The plaintiffs placed on the record the testimony of seven witnesses whose findings stand uncontradicted; the defendant presented no evidence. There is no need to dwell at length with their findings and conclusions. All of it can be capsulized as follows:

a) Dr. Michael H. Mitchell, Karla's present treating pediatric neurologist, a Lieutenant Colonel, United States Army Medical Corps and Chief of Pediatric Neu-

---

* On June 15, 1979 in open Court and on the record, the attorney for the government admits there was such a meeting and that he did agree to forego a continuance but waived no defense in doing so.

rology at Letterman Army Medical Center in San Francisco, stated that Karla has impairment of bulbar function which prevents her from talking and chewing, and barely permits her to swallow; in addition she has frequent trouble with aspiration; she experiences major and minor seizures which carry a risk of further brain damage; Karla is a quadriparetic—nearly paralyzed in all four extremities; she is susceptible to infection because of her lack of bladder and bowel control; her mental function is probably at the level of six to fourteen months; she can see and hear in only a limited way; she is tremendously frustrated since she functions "at a one year level of insight, feeling and emotion." Karla's condition is permanent.

b) Toussaint Le Clerq who testified at the original trial was in agreement with Dr. Mitchell; he reiterated what has been clearly established as to Karla's condition and which is recited in the first opinion.

c) Dr. Ted Eugene Chronister who also testified in the first trial stated that at Karla's present level of general health she will, to a reasonable degree of medical certainty, live out her full normal life span. He also pointed out that a major cause of death among the mentally retarded is their susceptibility to accidents; this does not exist in Karla's case since she cannot move. Dr. Mitchell also stated that any reduction in Karla's life expectancy of 70.5 years is slight.

*Limitation of Recovery to Amount in Administrative Claim*

The defendant argues that recovery in this case is limited to $750,000 as set forth in the plaintiffs' administrative claim filed on May 23, 1974 pursuant to 28 U.S.C. § 2675(b). The plaintiffs counter by resting on the exception recited in said section authorizing greater recovery "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."

In order to determine the applicability of this exception it is necessary to juxtapose Karla's condition and its prognosis at the time the administrative claim was made against her condition and its medical diagnosis thereafter.

As I stated in my June 15, 1979 opinion assessing liability, "From August 2, 1972 [the date of the injury] on there were a series of hospitalizations for various reasons including institutionalization at the Hospital for the Mentally Retarded in Delaware from April 1, 1974 to December 1, 1975. Mrs. O'Neil [Karla's mother] also testified that from December of 1975 to August of 1977 Karla was treated through the Institutes for the Achievement of Human Potential in Philadelphia, a non-profit institution which specializes in training uninjured brain cells. It appears nothing much could be done for this child." (At 1051–1052). The stark reality of Karla's irreversible physical and mental destruction wasn't cast until 1977. It must be noted that during this long period, after August 2, 1972, the many doctors who were consulted all voiced the optimistic opinion that Karla would make developmental progress under proper treatment. In August of 1972 Mrs. O'Neil was advised that the seizures could be controlled with proper medication and thus make it possible for Karla "to obtain a degree of self sufficiency." In April of 1974 at the Hospital for the Mentally Retarded in Stokley, Delaware, it was felt that Karla might well learn to walk; in January of 1975 Karla was making progress; again in 1975 at the Institute for the Achievement of Human Potential the evaluation team concluded that very definite progress could be made and so they accepted her for treatment—specifically they felt she could learn to crawl or creep, perhaps even to walk; that she could "gain enough functional language to be able to communicate her wants and needs." The fact is the doctors were correct; progress was made; by August of 1976, "she [had] made really very encouraging progress and we felt we were well on our way at that point" (Testimony of Dr. Wilkinson); she accomplished a range of motions and could follow verbal instructions

such as "raise your right hand" or "look at daddy." Unfortunately what was not reasonably discoverable or foreseeable was that the effort Karla expended in this learning process and the excitement it generated precipitated a whole series of new seizures; the entire process became counterproductive; it had to be abandoned. It was now established that retention of what had been accomplished or any further progress was not possible. All this evidence is uncontradicted by the defendant.

It seems clear to me that these facts prove that at the time the administrative claim was filed it was not known to the parents or to the doctors that Karla would never improve; never acquire a degree of self sufficiency. Only Karla's reaction to the intervening medical and therapeutic efforts definitively established the zero prognosis of her case. Whether these facts which were ascertained during this period "should be treated under the category of newly discovered evidence rather than as intervening facts" is not necessary because they are "clearly one or the other and, being so, the plaintiff is not limited in [her] recovery to the amount of [her] administrative claim." *United States v. Alexander*, 238 F.2d 314, 318 (5th Cir. 1956).

In *Husovsky v. United States*, 590 F.2d 944 (D.C.Cir.1978) the court accepted changed circumstances for an award in excess of the administrative claim, stating the District Court "did not err in determining that a claim in excess of the administrative claim was allowable in view of 'sufficient intervening facts to warrant reassessment of plaintiff's life expectancy.'" *Id.* at 954. And in *Joyce v. United States*, 329 F.Supp. 1242 (W.D.Pa.1971), *vacated on other grounds*, 474 F.2d 215 (3rd Cir. 1973) involving complex head injuries the court noted,

> Only after extensive physical, psychological and psychiatric examination was it possible to determine the nature of the plaintiff's injuries. A rule that would require the plaintiff to know the full extent of his injuries when they are such that medical science cannot immediately establish them is neither logical nor practical. *Id.* at 1247–1248.

As the plaintiffs argue, Karla's condition is certainly a most "complex" one. At the time the claim was filed she was only three years old; the testimony shows her very age prevented any conclusion that her condition was untreatable; the doctors at that time thought it was treatable; her initial success substantiated their opinion; only the ultimate failure of the treatment changed the prognosis.

The defendant points to certain statements in this Court's opinion on liability, as findings that militate against the exception urged by the plaintiffs:

> . . . that had the August 2 incident not occurred, Karla would have been able to walk, talk, care for herself and be trained for employment in some capacity; that she will never be able to do any of those things; and that the August 2 incident was a grand mal seizure. At 1056.

. . . . .

> . . . As Dr. LeClerq stated, one must look to the entire picture, which shows a marked deterioration in Karla's EEG after August 2. To Dr. LeClerq, the post-August 2 development of Karla was controlling because there was no evidence she developed after that. Indeed, the records show a worsening of Karla's condition. Prior to August 2, Karla was developing. Furthermore, Dr. Velat, who is the only doctor who personally examined Karla before and after the August 2 incident, stated that on July 31 she was alert, responsive and interacting, whereas after August 2 she was neither alert nor interacting, had no relationship with what he was doing during the examination and had no eye contact with him at all.
>
> At 1056.

Indeed those findings are correct but they are not inconsistent with what I am now saying. Dr. LeClerq was not discussing Karla's potential for improvement as it was diagnosed following the August 2 incident. Considering the totality of the facts, Karla is today the same hopeless human being she was in August 1972; she has life

but does not live. From this level the doctors opined that medical science could salvage what was left of this child's brain and restore to her a degree of self sufficiency. And as I have described, there was validity to their thinking, but the counterproductive circular effect of improvement, generating seizures, simply was not reasonably discoverable; only the intervening facts showed that the destruction caused by the defendant's negligence was irreparable. I find the plaintiffs are correct and are entitled to damages in excess of the administrative claim.

## DAMAGES

■ The plaintiffs and the defendant agree that in a personal injury case Pennsylvania permits recovery for loss of future earning capacity, past and future medical expenses, past and future pain and suffering, and future institutionalization expenses. *Frankel v. United States*, 321 F.Supp. 1331, 1345 (E.D.Pa.1970), *aff'd sub nom., Frankel v. Heym*, 466 F.2d 1226 (3rd Cir. 1972). Likewise, they agree that the law of Pennsylvania, where the tort occurred, controls the measure of damages as well as the liability of the United States. *E. g., Neal v. United States*, 562 F.2d 338, 341 (5th Cir. 1978); *see Caron v. United States*, 410 F.Supp. 378, 392 (D.R.I.1976), *aff'd*, 548 F.2d 366 (1st Cir. 1976).

*Loss of Earning Capacity :*

The defendant is correct in stating that prior to the critical date Karla was mentally retarded. From this premise the government syllogizes that since the tables compiled from the United States Department of Labor "do not reflect the employability of mentally retarded people, or if indeed whether the tables reflect that mentally retarded people were considered," it must be concluded that any computation of damages would be inadmissibly speculative, and so no award can be made for loss of earning capacity. *Massachusetts Bonding Co. v. United States*, 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956) (speculative damages not permitted under Federal Tort Claims Act). I do not agree for the reasons which follow.

■ The plaintiffs are seeking recovery for total loss of earning power. "Under Pennsylvania law, a plaintiff seeking recovery for total loss of earning power must show two things: (1) a permanent injury and (2) a total impairment of earning power." *Gary v. Mankamyer*, 403 A.2d 87, 89 (Pa.1979). In no way can the government refute that these two criteria have been satisfied. If follows it was proper to then introduce the economist's calculations as to the plaintiff Karla's projected losses, provided a base was established from which they could be computed. It was settled that absent the defendant's negligence Karla would have been employable in such jobs as an assembly line worker, cleaning service worker and for private household work. The fact she would have grown up as a mildly retarded person is of no consequence. There is no evidence, nor has the defendant cited any precedent to support its position, that the mild retardation which would have existed summarily bars any consideration of loss of earning capacity. The fact is clear that Karla would have had an earning capacity, and was prevented from exercising it because of the August 2, 1972 incident. "On the claim for future loss of earning capacity the question is to what extent has [the injured person's] economic horizon been shortened because of the injuries." *Frankel, supra*, 321 F.Supp. at 1337, citing *Bochar v. J. B. Martin Motors, Inc.*, 374 Pa. 240, 97 A.2d 813 (1953). The economic horizon in this case wasn't very high. It was set at the level of jobs which persons of average intelligence are not likely to take. As the plaintiffs point out, the economist explained that his computations were for workers with zero to eight years of schooling and, taking the assembly line worker as an example, it involves a simple repetitive task which, when performed, commands a wage regardless of mental capacity. No refuting evidence was offered by the defendant.

■ Dr. Keenan, the economist, calculated that Karla's net lifetime earnings reduced to present value would have been $68,073.00 as an assembler, $45,666.00 as a

cleaning service worker and $24,299.00 as a domestic. Lacking the ability to foresee what might have been had Karla not been injured, I can only conclude that the evidence fairly justifies a finding that Karla could well have worked as an assembler, and I therefore award $68,073 for the loss of future earnings.

*Medical Expenses*

*Admissibility of Exhibit 6*

The medical expenses claimed by the plaintiffs are detailed in exhibit 6, which is a letter signed by "John C. Lamb, Clients' Rights Advocate," at the Golden Gate Regional Center, San Francisco, California; the Center is one of twenty-one similar non-profit corporations funded by the State of California. Their purpose is to provide services to developmentally disabled people. After an initial examination of the subject by a physician and a psychologist to determine that the person is developmentally disabled, a team of professionals, *i. e.*, a physician, psychologist, registered nurse and an occupational therapist, determine an individual plan most appropriate for the patient; the services are then purchased by the Center and monitored through a case worker who is a Master of Social Work (MSW). The MSW ensures that the services are delivered and that the person is progressing, and that the goals and types of services are changed if necessary.

Mrs. O'Neil took Karla to the Center for just such an evaluation, and she was examined. Mr. Lamb met with her treatment team and explained what was needed; the information was then compiled and incorporated in the document marked exhibit 6. The defendant urges the Court not to consider this evidence, which I permitted in the first trial. It contends the entire document is inadmissible because Mr. Lamb is not a medical expert and even if he were, he did not prepare nor participate in preparing exhibit 6; it is hearsay which does not fall within any of the exceptions set forth in the Federal Rules of Evidence. I do not agree.

It is the function of the Center to formulate treatment plans and pursuant to this mission the document in question was prepared in the ordinary course of its business. Each of the persons whose conclusions are included in the letter was acting in the course of his regularly conducted business. The letter is therefore admissible under Fed.R.Evid. 803(6) as a record of a regularly conducted activity. Finally, exhibit 6 is nothing more that a summary of Mr. Lamb's in-court testimony which was admissible in the first instance. I reaffirm my ruling as to exhibit 6 and now will turn to the figures thereon in computing plaintiffs' damages.

Karla requires around-the-clock care by a person with training comparable to that required to become a registered nurse. The complexities of her disability complicate, to major proportions, even the otherwise simple tasks such as eating and brushing teeth. To date Mrs. O'Neil, herself a registered nurse, has provided these services, but she is not physically able to continue and, indeed, this fact is entirely irrelevant. *Rodriguez v. McDonnell Douglas Corp.*, 87 Cal. App.3d 626, 151 Cal.Rptr. 399 (1979).

The unrebutted testimony—in fact the only uncontradicted evidence in the case—is that the present fair and reasonable cost of in-home nursing care is $68 per eight hour shift. Reduced to present day value, the cost of lifetime round-the-clock nursing care is $1,208,601.00. When combined with other future medical expenses as set forth in exhibit 6 and the doctors' testimony as to need for frequent pediatrician visits, laboratory tests, occupational and speech therapy, the projected amount of money needed for such future medical care, including nursing care, reduced to present value, is $1,303,068.00. This figure does not take into account the miscellaneous cost for wheelchairs, for which $4,117.20 is awarded. And as to care for Karla up to the date of the trial, Mrs. O'Neil testified that she has expended $23,873.20. Again the government offers no evidence to the contrary; Mrs. O'Neil is entitled to be reimbursed this amount.

■ The plaintiffs request an award of $5,000,000 for past and future pain and suffering and permanent total disability. In determining what this amount should be, I find that what I stated in *Caron v. United States*, 410 F.Supp. 378 (D.R.I.1976) applies in this case. I can do no better than to adopt and incorporate the same thinking and expressions in this case.

I need not repeat what this child has endured, the nature of her injuries, and her future suffering. It has all been discussed at length. Before the Court, there is a wasted mind [with a mental function of six to fourteen months; impairment of bulbar function, which refers to the mouth, pharynx, larynx, respiratory control, and cardiovascular control; inability to chew and talk; continuing seizure disorders; no motor capability—she is a quadriparetic—nearly paralyzed in all four extremities; poor muscle control, she cannot sit, stand or even hold her head straight for more than thirty seconds; no voluntary bladder or bowel function and yet feels pain and becomes agitated]. She will never be free from the pain and suffering of seizures and the daily frustrations of retardation.

I must exercise my discretion and make an award that comports with fairness. In all candor such an exercise is nothing more than the administration of personalized justice. How can it be otherwise when the end product of existing decisional law confesses that the computation of an award for pain and suffering cannot be impersonalized through the formulation of any inflexible rule? As a consequence, what I do here, in the exercise of what I deem to be "sound discretion," has to be a manifestation of my own economic predilections in repairing a harm caused by another's wrong. However else it may be termed, it is nothing more—it is nothing less.

*Id.* at 396.

And finally, again what I stated in *Caron, supra*, I repeat here, "[a]pplying the guides I have previously articulated in as dispassionate a way as my abilities allow, and keenly sensitive to the responsibility which is mine", I must determine an amount which is a fair award. In *Caron*, I awarded $500,000; using this amount as a guide is appropriate in this case.[1] The plaintiffs argue that the injuries in this case are far more devastating than Caron's and call for a correspondingly greater award. The deprivation suffered by Karla is total; whereas, Caron was expected to reach a mental age of 6 to 8 years and function in some limited way. This difference alone appears to warrant a greater award; however, the degree of pain and suffering per se imposed on the victim is not always directly related to the deprivation. At any rate, I need not conclusively determine this issue today, since I cannot find any appreciable measurable difference in pain and suffering between these two cases. Since Karla is entitled to the same value of damages Caron received, Karla's award must reflect the inflation that has occurred since that time. This does not involve any speculation as to future inflation; it merely recognizes what has already happened, of which I can take judicial notice.

■ The government argued orally that an award for pain and suffering may not be adjusted to account for inflation which has occurred since a comparative award was ordered in a comparable case. I disagree. The computation of damages must be made in terms of the dollar value as of the time of the award. The victim's entitlement must be in direct relation to what can be done with the money received. The common denominator is the ability of the money awarded to acquire for the injured party those services or objects which, in some measure, compensate for the pain and suffering endured; and, in the last analysis it lies in what the dollar will purchase.

1. It may be that Pennsylvania allows recovery for loss of enjoyment of life, *Robert v. Chodoff*, Pa.Super., 393 A.2d 853, 871 (1978), and, if so, the question that arises is whether or not it is an assessment that can be made in addition to an award for pain and suffering. However, this is not before me, since the plaintiffs neither pleaded nor briefed this specific question.

In *Martin v. Southern Railway Company*, 225 Tenn. 77, 463 S.W.2d 690 (1971) (a case comparing awards) the court stated:

> On this issue we can also consider the impaired purchasing power of the dollar . . . Since compensation means compensation in value; that is the value of the dollar lies in what it will buy, then in order to compare the award for the intangible elements of damage in the *Dixie Seed* [*Dixie Feed and Seed Co. v. Byrd*, 52 Tenn.App. 619, 376 S.W.2d 745] case against the award for the intangible elements of damage in the case at bar, we will have to add [20%] . . . .

*Id.* at 692.

The overall inflation rate for the past four years has been 8.7 percent;[2] $696,000.00 today is equivalent to $500,000.00 in February 1976. I award this sum for pain and suffering.

In summary, the damages awarded are:[3]

| ITEM | AMOUNT | PAYEE |
|---|---|---|
| Loss of earning capacity | $ 68,073.00 | Karla Foskey |
| Future medical care | 1,303,068.00 | Karla Foskey $706,262.86 |
| | | Yulonda O'Neil $596,805.14 |
| Past medical expenses | 8,373.21 | Yulonda O'Neil |
| Other past expenses | 23,873.20 | Yulonda O'Neil |
| Hydraulic trip lift | 475.00 | Yulonda O'Neil |
| Hospital bed | 1,147.00 | Yulonda O'Neil |
| *Adaptive feeding equipment* | 550.00 | Yulonda O'Neil |
| Wheelchairs to age 18 years | 1,831.48 | Yulonda O'Neil |
| Wheelchairs after age 18 years | 2,285.72 | Karla Foskey |
| Pain and Suffering | 696,000.00 | Karla Foskey |

(amounts computed for Yulonda O'Neil are to age 18 years)
(the foregoing breakdown is taken from exhibit 6)

|  | |
|---|---|
| Total—Karla Foskey: | $1,472,621.58 |
| Yulonda O'Neil: | 633,055.03 |
| | $2,105,676.61 |

## FUTURE INFLATION

The foregoing figures do not anticipate future inflation; the plaintiffs urge consideration of this factor which would raise the present award well over eight million dollars ($8,000,000).

The plaintiffs concede that under Pennsylvania law, consideration of inflation in making awards for future damages is not permitted. However, they argue that this should not be controlling because state law merely controls the recoverable items of damages and not the amount of each item; federal courts are free to use the method they feel best fulfills the purposes of the Federal Tort Claims Act which is to fully compensate persons who are injured by the negligence of federal employees.

The Third Circuit, which encompasses Pennsylvania, has not as yet had the opportunity to determine whether it is permissible to assess future inflationary costs; therefore, I must and should take guidance from my own circuit judges. In *Williams v. United States*, 435 F.2d 804 (1st Cir. 1970), the Appellate Court spoke to this issue as follows:

> Nor, finally, can we accept plaintiff's argument that the anticipated future earnings are to be increased by some multiple taken out of the air in the name of future inflation. While plaintiff submitted a number of cases making reference to inflation, most of them are simply rejections of comparisons with past verdicts, on the ground that subsequent, already demonstrated, inflation has made the comparison inapposite. None clearly accept the use of predictions as to future inflation. While we have found a case which may be read as speaking in terms of future inflation, *Southern Pac. Co. v. Zehnle*, 9 Cir., 1947, 163 F.2d 453, and one which must be so regarded, *Brooks v. United States*, D.S.C., 1967, 273 F.Supp. 619, both rely exclusively on cases involving inflation already established. Particularly in considering predictions of an accumulated estate, which, if there is inflation, must be adjusted for possibly inflated expenses as well as earnings, we

2. The parties stipulated to this inflation rate.

3. In computing the damages, the only evidence the Court had was that introduced by the plaintiffs. It stands uncontradicted, since the government did not attempt to rebut it through its own witnesses. Certainly, the Court cannot go beyond the record.

consider such speculation inadmissible. (citations omitted) at 807.

■ Since *Williams*, the Tenth Circuit, after reviewing a number of cases from other circuits employing varying methods, concluded that a methodology used in *United States v. English*, 521 F.2d 63 (9th Cir. 1975) offered an acceptable rationale to calculate damages for loss of future benefits. It remanded the case to the trial court to "determine from the evidence a reasonable annual percentage figure for the purpose of accounting for probable wage inflation" (*Steckler v. United States*, 549 F.2d 1372 at 1378) during the work expectancy of the plaintiff. In light of *Williams*, the merits of the *English* decision is not for this Court; that must be decided by the First Circuit. I will not take anticipated future inflation into account.

## STATUTE OF LIMITATIONS

■ In post brief conferences with the Court the plaintiffs made known they do not argue the defendant's failure to plead affirmatively the statute of limitations as required by Fed.R.Civ.P. 8(c), because it is a jurisdictional issue and the government could well assert that it may be raised at any time. Instead they look to the facts, feeling secure they establish a timely claim.

The defendant rests on the recent United States Supreme Court decision, *United States v. Kubrick*, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). In this case the plaintiff, a veteran who was receiving disability benefits, was treated at a Veterans' Administration Hospital with neomycin for an infection of his right femur in April of 1968. Six weeks after this treatment he developed a ringing sensation in his ears and a hearing loss. In January of 1969 a doctor informed him that it was highly possible that the hearing loss was the result of the neomycin treatment he had received. At this time he did not know nor was definitely told that neomycin caused his injury and should not have been administered. In August of 1972 he learned that the government recognized that his hearing loss "may have been caused by neomycin,"

but that it felt the treatment was in accordance with "acceptable medical practices and procedures" and would not pay him any increases to the benefits he was receiving. He then filed suit alleging he had been injured by negligent treatment in the Veterans' Hospital.

The Court held that the statute of limitations started running in January 1969 when he knew he had been injured; the accrual of his claim need not await awareness by him that his injury was negligently inflicted. The Court stated that since he knew he had been injured then it was his responsibility to seek advice in the medical and legal community and determine within the statutory period whether or not to sue. It must be noted the Court is saying that when one is told it was "highly probable" a treatment caused a known injury it is sufficient to trigger the running of the statutory time.

In applying the teachings of *Kubrick* to the facts of this case the defendant's total argument may be quoted verbatim. It reads,

In this case, the Court has found in its Opinion of June 15, 1979, that Mrs. O'Neil, from the very first visit with Dr. Danits on February 14, 1972, had told him of Karla's back arching and other unexplained peculiar body motions. She also suggested to him that a neurological exam should be performed. As the Court stated on page 26 of the June 15 Opinion:

Karla already had a seizure disorder when first seen by Dr. Danits on February 14, 1972. The evidence establishes that on the facts before him, developed through his examination of the child, he should have launched a neurological study and prescribed anti-convulsant therapy . . . .

The Court has found as a fact that Dr. Danits did not launch a neurological study or immediately perform an EEG, which was a departure from accepted medical practice in Philadelphia at the time. It is undisputed, and in fact admitted by Mrs. O'Neil that during the entire period of treatment at the Philadelphia Naval Hospital she told Dr. Danits about

the back arching and Karla's eye fixation on patterns. She also testified that in March 1972 and June 1972, Karla suffered some type of seizures. (See copy of transcript pages attached hereto—T of 3/27; 3/28, and 3/29/78, pp. 111–113).

It is submitted that based on the March 1972 incident, all Mrs. O'Neil had to do was ask or seek advice in the medical community as to whether Karla was being competently treated. Being a registered nurse at the time, she was aware of who to ask and where to ask. She certainly was suspicious that something was wrong. It is therefore submitted that as of March 1972, Mrs. O'Neil knew Dr. Danits had not performed a neurological examination as of that date. She knew, as she had testified to, that Dr. Danits did not know what he was dealing with. Thus, as of March 1972, she knew Karla had been receiving improper treatment; she knew Karla had been wronged. (See *Kubrick*.) Under the *Kubrick* doctrine, it therefore must be that the accrual date was March 1972. The first Administrative Claim was not filed until May 23, 1974, which is well beyond the two years filing requirement set forth in 2401(b). (Defendant's memorandum in support of Motion to Dismiss).

I find this position illogical and insupportable on the uncontradicted evidence in the record. To begin with, the March 1972 incident merely involved an ear infection and nothing more. I do not interpret the testimony to mean that Karla's March illness was a seizure. Mrs. O'Neil gave the following testimony concerning Karla's illness in March 1972. (Tr. 1 at 105):

Q That was February 29; did Karla get an ear infection or some illness on March 2nd?

A Yes, beginning of March Karla started running a fever and I took her out to the Coast Guard dispensary in Cape May, New Jersey, to be checked and they didn't know what was wrong with her so they sent me up to Philadelphia.

Q You went to Philadelphia to the Naval Hospital?

A Yes, we left right away and went to Philadelphia to the Naval Hospital.

Q Was that one of the two visits that you did not see Dr. Danits?

A Yes, he wasn't there.

Q What happened at the Naval Hospital?

A At the Naval Hospital they checked her over and they said she had a middle ear infection.

Q What did they do for her?

A I am not positive but I'm pretty sure they put her on ampicillin and actofed.

Q You took her home with you?

A Yes.

Q And did she eventually recover from the ear infection?

A Yes.

Furthermore, the record shows, as I stated in my opinion establishing liability, that Dr. Danits saw Karla on July 10, 1972 and told Mrs. O'Neil that the EEG did not show any evidence of seizure activity. It follows the government's negligence extended to this date and thus the administrative claim was timely filed.

Turning to *Kubrick*, I find that it is not applicable to this case. The Court held the statute of limitations began to run when the plaintiff, who had been injured, was told by a doctor that it was probably caused by the defendant's treatment. The Court did not leave a plaintiff to suffer when totally ignorant that he was indeed injured. Some fact must logically initiate the knowledge. In *Kubrick* the doctor's statement was sufficient. In *Kubrick* there is no question that the hearing loss, *i. e.* the injury, preceded the plaintiff's meeting with the doctor; the Court did not say the statute started to run from the date the plaintiff first noted his auditory impairment; so in *Kubrick* even when an injury already exists something more is needed to start the limitation period. In this case there is no evidence which I can interpret as in any way advising Mrs. O'Neil in March

1972 of the injury which is the subject of this law suit. And, of course, there can't be because as of that time no injury existed. This is the point I find that the defendant has failed to realize. I clearly stated Karla was injured on August 2, 1972. *Kubrick* does not vitiate the basic law that there must first be an injury before there can be a cause of action, nor does it hold that a plaintiff has the responsibility of discovering negligence, however subtle, before it has caused an injury. I quite agree with the plaintiffs that if mere negligent treatment, before any injury occurs, starts the running of the statute of limitations, then depending on the gap between treatment and the occurrence of the injury, a plaintiff could lose his cause of action before it even arose.

I deny the defendant's Motion to Dismiss on the ground the claim "is barred in that it was not presented to the appropriate federal agency within two years after such claim accrued. 28 U.S.C. 2401(b)."

▪ The final belated defense the government now interposes is that the amended claim filed in July 1974 is a nullity; that 28 C.F.R. 14.1 *et seq.* Sections 14.3(b) and (e) provide:

> (b) A claim for personal injury may be presented by the injured person, his duly authorized agent, or legal representative.
> (e) A claim presented by an agent or legal representative shall be presented in the name of the claimant, be signed by the agent or legal representative, show the title or legal capacity of the person signing, and be accompanied by evidence of his authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative[;]

that this statutory provision has not been satisfied because the original attorney who filed the claim merely signed it as "attorney for Karla Foskey".

There is no merit to the government's position. The original claim signed by Yulonda Foskey was filed on May 23, 1974 and submitted to the Navy by Attorney Max Wistow with a cover letter. Certainly this letter suffices as "evidence of [Mr. Wistow's] authority to present a claim on behalf of a claimant." Following this there was an exchange of correspondence between Mr. Wistow and the Navy; it advised that separate claims had to be presented for Yulonda and for Karla Foskey. In response as requested Mr. Wistow filed two new claim forms and pointed out that he had "taken the liberty of signing" the new forms and hoped they would not require a third filing for that reason. These were accepted. (Letter of July 2, 1974 from Max Wistow to H. N. Munroe Cdr., SAGC, Department of the Navy, Washington, D. C.). I find the government was fully aware of Mr. Wistow's authority.

The government cites in support of its position *Caidin v. United States,* 564 F.2d 284 (9th Cir. 1977) (claim filed on behalf of a class of bank stockholders, held defective for lack of evidence that any of the class members authorized the plaintiff to represent them); *Pringle v. United States,* 419 F.Supp. 289 (D.S.C.1976) (a claim filed on behalf of a deceased son before plaintiff had been appointed administrator); *House v. Mine Safety Appliance Co.,* 573 F.2d 609 (9th Cir. 1978) (a claim signed by an attorney on behalf of a large number of claimants without evidence of authority to do so; the case was remanded by the Appellate Court for determination whether the attorney was in fact authorized. These cases do not support the defendant.

More on point is *Lunsford v. United States,* 418 F.Supp. 1045 (D.S.D.1976) (involving a claim signed by an attorney on behalf of a single client). The court denied the government's motion to dismiss. In doing so it held:

> I am of the opinion that a sufficient claim was presented in this case . . . . .
>
> \*   \*   \*   \*   \*   \*
>
> In my opinion, a signature as "attorney for" . . . suffices to show the capacity in which the claim is made. If there is a genuine question as to whether authority to present the claim actually exists, there are procedures by which this can be tested. I do not feel that any requirement calling for documentary evi-

dence of authority to present a claim is in accord with the purpose of the 1966 amendments to the Federal Tort Claims Act. As one court has noted, "(t)he purpose of the amendment was not to make recovery from the Government technically more difficult."

*Executive Jet Aviation, Inc. v. United States*, 507 F.2d 508, 515 (6th Cir. 1974).

In this case I find the amended claims are properly before the Court.